## KEARNS-GORSUCH BOTTLE CO. v. HARTFORD-FAIRMONT CO.

(District Court, S. D. New York. July 25, 1921.)

1. Contracts ⊚◯147(2)—What parties intended to be prima facie ascertained solely from words used in writing.

What parties to a written contract intended is to be prima facie ascertained solely from what they wrote.

2. Specific performance ⊚◯71 — Contract to execute patent licenses and leases held not beyond power of court to enforce.

Where contract sought to be enforced was one for execution of patent licenses and leases, held, that there was nothing beyond power of court in specifically enforcing defendant's standard printed lease and license.

3. Specific performance ⊚◯75—Not necessarily denied because granting would require court to supervise continued operation of manufacturing business.

A court is not required to refuse to grant specific performance of contract to execute patent leases and licenses by reason of the mere fact that it would necessitate the supervision by the court of continuous operation of a manufacturing business for a long time.

4. Reformation of instruments ⊚◯43—Burden on one praying reformation to show contract does not represent intent of parties.

In action for specific performance of contract, wherein defendant sought reformation, burden was on defendant to show that contract as written did not represent intent of parties.

**5. Reformation of instruments ⬅═25—One approving contract without reading it cannot claim mistake.**

One who approved contract without reading it cannot claim mistake, warranting reformation.

In Equity. Suit by the Kearns-Gorsuch Bottle Company against the Hartford-Fairmont Company. Decree for plaintiff.

Plaintiff's statement of facts is in substance as follows:

"The plaintiff is an old established glass-making concern, with two plants, one at Zanesville, Ohio, and the other at Barnesville, Ohio. In 1917 it began to realize necessity of automatic glass-making machines of the type known as feeders, whose function it is to move or feed molten glass from the tank to machines where it is formed. Negotiations between plaintiff and defendant began in 1917. Plaintiff was desirous of obtaining licenses for use of machines in connection with all kinds of ware made by it, and of excluding as many others as possible from using similar machines. It was the policy of defendant to grant licenses to a comparatively small number of manufacturers and to build them up. Plaintiff insisted that it should be able to get as many feeders as it should need in its business, and defendant agreed to this. Defendant agreed that, if plaintiff took a certain number of machines on certain dates, licenses would not be granted to others for use in manufacturing certain kinds of ware. Plaintiff enlarged his plant and conferred with defendant regarding installation of feeders, and defendant did nothing in any way suggesting that agreement was not in full force and effect, except that exclusive use had been canceled. Defendant refused to furnish the feeders, and plaintiff sues for specific performance."

Charles Neave and Stephen H. Philbin, both of New York City, for plaintiff.

Thomas D. Thacher, of New York City, and Francis W. Cole and Herbert Knox Smith, both of Hartford, Conn., for defendant.

HOUGH, Circuit Judge. No objection has been taken to the bill, in that it seeks specific performance of a contract relating to personalty; the point has not been mentioned. From this I infer that counsel agree the case as alleged to be one justifying appeal to this admitted, but infrequent, branch of jurisdiction. Therefore I shall say no more on that subject.

Nor is it necessary to dwell on the meaning of the contractual words and sentences used in Plaintiff's Exhibits 1 and 2. I think no one has doubted that, if we had no more than the documents just described, all would agree as to their meaning. Perhaps some would be surprised that such an agreement had been made, but that has nothing to do with the meaning of the language used in carefully executed contracts.

[1] I note defendant's contention on its brief, that "the contract is ambiguous," and, "when construed in the light of the intention of the parties," means that the right to what plaintiff sues for depends upon timely exercise of option for six additional machines. But one starts in matters resting on a written contract with the inexorable rule that what the parties intended is to be (prima facie) ascertained solely from what they wrote. This is a rule plainly resting on common sense and justice, and needs no citation of the abundant authority enforcing it. Therefore I regard this contention of defendant as an endeavor to assume the main point in litigation; i. e., that the written words do not in fact represent what *both* parties intended to express. Result is that, in what I regard as the proper use of the word "ambiguity," the contract writings in suit are not ambiguous.

[2, 3] Assuming now absence of ambiguity in the contracts as written, defendant urges (before reaching the main case) that specific performance cannot be ordered, because by so doing the court would require from both parties, and would be required to supervise, "the exercise of skill, personal labor, and experienced judgment in the continuous operation of a manufacturing business."

The contention rests on decisions, of which Rutland Co. v. Ripley, 10 Wall. 339, 19 L. Ed. 955, and Javierre v. Central Altagracia, 217 U. S. 502, 30 Sup. Ct. 598, 54 L. Ed. 859, are controlling here. The law *does* move with the times, and usually moves first in the lower courts; indeed, the historic function of Supreme Courts is to prevent too rapid advance. For me the statement (or perhaps dictum) of Life Preserver, etc., Co. v. National, etc., Co. 252 Fed. 139, 164 C. C. A. 251, still represents the present state of the law, viz. protracted supervisions of a business *should not* be assumed, but it is not true that it *cannot* be assumed. Everything depends on how insistently the justice of the case demands the court's assumptions of difficult, unfamiliar, and contentious business problems. The tendency of the times is to

"take on" harder and longer jobs. Great Lakes, etc., Co. v. Scranton Coal Co., 239 Fed. 603, 152 C. C. A. 437; Texas, etc., v. Central, etc., 194 Fed. 1; American, etc., v. Bunker Hill Co. (D. C.) 248 Fed. 172; Gas Securities, etc., v. Antero, etc., 259 Fed. 423, 170 C. C. A. 399. As a judge of first instance I would not nowadays hesitate to undertake any business enterprise for which, with the support of competent receivers, I thought a reasonably intelligent judge reasonably fit. Yet it might easily be that most appellate courts would still reverse that discretionary order. But the reversal could only logically or lawfully rest on an ascertained abuse of discretion; the error would be in degree, not kind.

The point last stated was not argued orally; and, though I am ready to meet it, I cannot think that it arises in this case, at least just at present. The specific performance first sought, the act without which nothing more can happen or ought to happen, is that defendant shall prepare, execute, and tender to plaintiff six "leases and licenses," like Plaintiff's Exhibit 2, whereupon plaintiff must pay defendant $18,000. About this there is nothing difficult, and this is the first part of the prayer of the bill.

Assume that this were done, what is left is just this: Is there anything beyond the power of a court thoroughly used to dealing with licenses under patents, *in specifically enforcing the defendants standard printed lease and license?* Especially when (as revealed by the answer) defendant does not say it cannot live up to its ordinary contract, or that there is any business difficulty in so doing, but only urges that for various reasons it ought not to be compelled to deliver a lease, etc. I see no difficulty. So far, then, as this branch of the case is concerned I think plaintiff should have a decree, awarding it six leases and licenses. Whether defendant has, then, any reason to advance, why it should not live up to a form of agreement devised by itself, and used (apparently) 113 times before any dealings with plaintiff, is a matter which may be left to the future. There is nothing in pleading or evidence to show even future difficulty.

If either party makes difficulties, if, for instance, defendant, after delivering a "lease and license," substantially refuses to install, or installs improperly, questions will arise requiring thought; but they do not wholly defeat this bill. Much less do the possible (and suggested) rows over improvements, royalties, etc., defeat all relief. The books are full of just such troubles between licensor and licensee, especially when licensor retains title to a cumbrous machine, which he devoutly hopes will live its life where the licensee puts it.

Thus the cause reaches the point where defendant must make good its affirmative defense, which is in substance that, if Plaintiff's Exhibit 1, the written agreement of April 23, 1918, were what it was intended to be, the evidence shows no breach by defendant. There is here to be noted a striking difference between this main point in the case as pleaded and as argued.

The counterclaim is clear, though it is not labeled with that name. It avers as new matter that the parties intended, and it was agreed between them, that all of said contract, including article 1, was to be dependent on and inseparable from the other conditions thereof (folio 21); wherefore the written agreement "should be reformed so as to state unequivocally and express in plain and unambiguous language" (folio 24) the contended-for understanding and oral agreement, viz. that if Kearns Company did not take and pay for six leases, etc., within the times appointed, all rights were lost by plaintiff. And on this allegation (folio 26) is based the prayer that the agreement relied on by plaintiff "be declared abrogated, void, and of no present force and effect"—in other words, held (1) not to represent the real contract, because the real contract was to be established by testimony; and (2) as revealed by evidence terminated by plaintiff's default. This pleading prays for reformation; but the argument made seems to me to abandon hope of proving that mutual mistake which (in the absence of fraud) the pleader relied upon. But, instead of that measure of relief, it is argued only: (1) Defendant made a mistake; (2) plaintiff knew the mistake was being made, and (3) kept quiet about it; wherefore the parties should be left to the law, and equity refuse the extraordinary remedy of specific performance. Cathcart v. Robinson, 5 Pet. 264, 8 L. Ed. 120; Pope etc., Co. v. Gormully, 144 U. S. 237, 12 Sup. Ct. 632, 36 L. Ed. 414.

But plainly "keeping quiet about it," when A. sees B. doing something that A. knows B. does not intend to do, is a species of fraud. It entitled B. to rescission or reformation; so the argument further is that, though the mistake were on B.'s part alone, there was no meeting of minds, and the same result follows. Hearne v. Insurance Co., 20 Wall. 488, 22 L. Ed. 395; Salomon v. North Brit-

ish, etc., Co., 215 N. Y. 214, 109 N. E. 121, L. R. A. 1917C, 106; Green v. Stone, 54 N. J. Eq. 387, 34 Atl. 1099, 55 Am. St. Rep. 577.

Just where or how the line is to be drawn between that measure of mistake, mutual or otherwise, or of absence of mind meeting, which justifies rescission or reformation, and that other and lesser quantity of the same which only induces the chancellor to refuse equitable affirmative relief, and to leave the parties to such remedies as the law affords, is not shown by any of the cases cited or known to me. I think it impossible to draw any such line of demarcation. The nearest approach to accuracy possible is to say that there are cases where equity, by following the law, but with the far more drastic remedies of chancery, will work such injustice; that a chancellor flatly refuses the remedy (remembering the old theory of grace), assigning as reason something to the effect that the case is of such a character "that plaintiff has no right to call upon a court of equity" for relief (Pope Mfg. Co. v. Gormully, supra), or that the decree prayed for "would enforce the letter, but sacrifice the spirit" (Rushton v. Thompson [C. C.] 35 Fed. 635). This is really no more than the doctrine of clean hands, or an unusual application of the maxim requiring him that seeks equity to do it. But there is always some moral element lacking in plaintiff's position.

[4] Considering the argument just reviewed, I will summarily find that there is no proof whatever of mutual mistake, an opinion firmly held at the conclusion of testimony and strengthened by reading the record. Whether there was any other mistake available to defendant for any purpose is a question to be approached, remembering that the burden is strongly on him who alleges that the contract as written does not represent the intent of parties. McGovern v. McClintic, etc., Co. (C. C. A.) 269 Fed. 911. No very elaborate fact findings seem to me necessary, but I will separately state the following points persuasive or crucial with me.

(1) In March, 1918, Mr. Smith was instructed by his executive committee (Mr. Honiss, presumably present) not to make any contract with Kearns Company unless it took and operated at least five machines. Consequently the agreement as made, and/or as written on April 16th, was unauthorized. In either shape it was new matter for the executive committee, and since the Kearns representatives could do no more than submit what they got to their directors, neither party was bound until both boards had approved.

(2) The Hartford representatives at Pittsburg on April 2d were deeply and principally interested in promoting large units of manufacture. If a man would agree to take many machines, he would be given a monopoly in a certain field. That was the much talked of "Hartford policy." I believe it to be true that at Pittsburg there was nothing said to the effect that, if Kearns Company took two machines, they should have an "unlimited right to as many as they wanted to demand." But I am equally sure that the Kearns representatives were not told that, if they did not take two and then six more, they would have no rights at all.

(3) Mr. Honiss' "Hartford draft" represented nothing but his own idea of what was desirable. Mr. Smith agreed. But as the draft, if executed, would have left Kearns Company with two machines, in violation of executive committee orders, I find that said draft did not represent what had been agreed upon anywhere with authority. The whole matter was still fluid on the morning of April 15th.

(4) The moment Mr. Stewart refused to take eight machines, certainly everything began anew, and I find that never at Hotel Belmont was Kearns Company told by word of mouth that, if it did not take eight, it should have no right to more than two, machines.

(5) The contract dated April 23d was read aloud at Hotel Belmont, and read at least in substance before the Hartford executive committee. It was examined by counsel before submission to Kearns Company directors. Any person of ordinary intelligence and fair business education would infer, from hearing the paper read, that Kearns could get whatever they needed for their own business (in the way of machines) from defendant, but would not be given monopolistic privileges unless eight machines were taken in the short time specified.

(6) Assuming the Hartford machine to be a good one, any positive limitation on supplying the normal growth of Kearns Company would have attracted attention at once, and aroused resentment.

(7) The Kearns Company, when by its board of directors it accepted the contract of April 23d, had no reason to doubt, and every reason to assume, that it could get Hartford

machines as reasonably required, even though the rapid development implied by six machines proved impossible; nor had any director of Kearns Company any other or better information than the board.

(8) The relations between plaintiff and defendant, as evidenced by letters and engineers' visits before February, 1920, are inconsistent with defendant's present position; but plaintiff's increase of liability by issuing preferred stock in the fall of 1919 is consistent with its present position.

Conclusion is as follows: Mr. Honiss made a mistake, in that he did not succeed in expressing in words of his own choosing his own wishes or ideas. Whether Mr. Smith made a mistake I am not sure, for any one accustomed to writing can understand and sympathize with the process of getting into a fog of your own words; but how Mr. Smith could ever have read or heard read Plaintiff's Exhibit 1, and been mistaken as to its meaning, is quite beyond my comprehension.

[5] That the corporation defendant made the mistake of misunderstanding Plaintiff's Exhibit 1, is only true if the company is identified with Mr. Honiss, if his mistake was the corporate mistake. This cannot be, for Mr. Honiss had no authority to offer as a corporate act Plaintiff's Exhibit 1. That contract being new matter, it was for the executive committee to learn and inwardly digest the same; the defendant spoke when the committee acted. Again, I cannot think that any committee could have had Plaintiff's Exhibit A fairly explained, and then make the mistake now claimed. If the explanation was so incomplete and partial as to deceive, such deception should have been pleaded. I think the last analysis of the corporate position is this: The committee says: We in effect approved Exhibit A without reading it, and that was our mistake. This position may be true in fact. I incline to think it is. But it is bad in law, and so bad that there is no necessity for discussion.

Next, the plaintiff did not know defendant was making any mistake, and did believe what it now advances. There was quite likely no talk on the subject, it was assumed by plaintiff, who was as much concerned as defendant in dreams and schemes of monopoly; both parties were counting unhatched chickens.

Finally, there is nothing in Exhibit A as written which seems to me morally wrong, unfair, or inequitable. Therefore plaintiff is entitled to a decree directing defendant to execute and tender six leases and licenses. Plaintiff will recover costs.

The provable damages for delay seem to me very modest; if they cannot be agreed upon, the master will be Henry Melville, Esq. The original exhibits (most of them) have been furnished me by counsel; they will now go to the clerk, with special directions for safe-keeping, but may be redelivered to counsel (each side getting its own exhibits) on receipt of the attorney of record.

The decree signed reads in part as follows:

This cause came on to be heard at final hearing at this term, and was argued by counsel, and thereupon, upon consideration thereof, it was ordered, adjudged, and decreed as follows, viz.:

First. That the agreement heretofore entered into between the plaintiff, the Kearns–Gorsuch Bottle Company, and the defendant, the Hartford-Fairmont Company, and attached as Exhibit A to the bill of complaint herein, is valid, binding, and effective; that the plaintiff is entitled to specific performance thereof, conditioned upon the plaintiff's performance of its reciprocal obligations thereunder.

Second. That the defendant, upon the tender of $18,000 to it by the plaintiff within 30 days after entry of this decree shall execute and deliver to the plaintiff six licenses and leases similar to the two licenses and leases, Nos. 114 and 115, heretofore granted by the defendant to the plaintiff, the date of said six licenses and leases to be the date of their execution, and the plaintiff shall thereupon execute and deliver to the defendant duplicate originals of said six license and lease agreements.

Third. That the defendant shall, pursuant to the terms of the said agreement and of the said six licenses and leases, perform its obligations to furnish and install the six paddle feeding machines covered by said six licenses and leases as soon after the granting to the plaintiff of the said six licenses and leases as existing conditions shall permit.