CHARLES M. RICE, APPELLANT, V. E. C. GIBBS,
APPELLEE.

[FILED NOVEMBER 25, 1891.]

1. **Real Estate**: CONTRACT FOR SALE: OPTION: ASSIGNABILITY.
   E. C. G. executed her agreement in writing with F. A. A. for
   the consideration of $5 to execute and convey to him, at any
   time within five months, upon his request in writing, certain
   real estate in the town of Kearney, upon payment of $3,500
   as follows: $1,500 on the execution of the deed, $1,000 in one
   year, and $1,000 in two years, with interest at ten per cent on
   the deferred payments, with covenant in favor of the heirs,
   executors, administrators, and assigns, obligatory upon the re-
   spective parties. The agreement was assigned to C. M. R. for
   value, who, by responsible agent elected to purchase the property,
   tendered payment of the first installment, with promissory notes,
   secured by mortgage on the premises, for the deferred payments
   within the time limited by the option of the purchase. *Held*,
   That the option of purchase was assignable to third parties,
   with right of action *eo nomine*, that the assignee had substantially
   complied with the conditions of the option and was entitled to
   the specific performance of the contract.

2. **The evidence** examined, and found not to sustain the judg-
   ment below.

APPEAL from the district court for Buffalo county.
Heard below before HAMER, J.

*Marston & Nevius*, and *T. M. Stuart*, for appellant, cited,
contending that mutuality was not required in unilateral
contracts: Pomeroy, Spec. Perf., sec. 169, and notes; *Moses
v. M'Clain*, 2 S. Rep. [Ala.], 742, 744; *Hall v. Center*, 40
Cal., 67; *R. Co. v. Flanagan*, 3 Am. St. Rep. [Ind.], 675;
*Crawford v. Payne*, 19 Ia., 172. All contracts, save those
for personal or professional services, are assignable: *Wag-
ner v. Cheney*, 16 Neb., 202; 2 Story, Eq. Jur., sec. 1040;
*Pierce v. Robinson*, 13 Cal., 117; Pomeroy, Spec. Perf.,
sec. 487.

*Calkins & Pratt, contra,* cited cases referred to in opinion.

COBB, CH. J.

This action was brought April 27, 1888, to enforce the specific performance of the following contract :

"Articles of agreement made this eighteenth day of July, 1887, by and between Miss E. C. Gibbs, of Buffalo county, Nebraska, of the first part, and F.A. Archibald, of Hamilton county, Ohio, of the second part, witnesseth, that the said party of the first party, in consideration of the sum of $5.00 (five) in hand paid, the receipt whereof is hereby acknowledged, hereby covenants and agrees to sell and convey to the party of the second part at any time within five months, on being thereunto requested in writing, the premises hereinafter described on the terms and conditions hereinafter mentioned. On the failure of the party of the second part to notify the party of the first part within the time above specified of his intention to take the property on the terms and conditions hereinafter specified, then this contract shall be conclusively forfeited and determined, and the party of the second part shall forfeit the payment above made by him, which shall be retained by the party of the first part in full satisfaction of all damages by him sustained by reason hereof; if the party of the second part shall declare his option to take said property in the manner and within the time aforesaid, then the said party of the first part hereby covenants and agrees that he will convey and assure to the party of the second part, in fee simple, clear of all incumbrances whatsoever, by good and sufficient warranty deed, the following lot, piece, or parcel of ground, viz: South half lot 110, Wyoming ave., Kearney, embracing 25 feet front, 130 deep, and the second party of the second part covenants and agrees to pay the said party of the first part, if he shall declare his option to take said

property, the further sum of $3,500, payable as follows: Fifteen hundred dollars, cash, upon execution of deed, one thousand in one year and one thousand in two years (from date of deed) with interest at 10 per cent on deferred payments. It is mutually agreed that all the covenants and agreements herein contained shall extend to and be obligatory upon the heirs, executors, administrators, and assigns of the respective parties hereto.

"In witness whereof, the parties to these presents have hereunto set their hands and seals the day and year first above written.      Miss E. C. Gibbs. [L. S.]
"F. A. Archibald. [L. S.]"

Second—That on October 14, 1887, Archibald, without having declared his option to take the property, assigned the contract to the appellant for the sum of $175.

Third—That on December 17, 1887, George W. Frank addressed a letter to the appellee as follows:

"Madam—Referring to your conversation with Mr. C. H. Elmendorf a few days since as to an extension of an option to purchase the south one-half of lot one hundred and ten on Wyoming avenue, in the city of Kearney, Nebraska, embracing twenty-five foot front and rear by one hundred and thirty feet deep, dated July 18, 1887, signed by yourself and F. A. Archibald and acknowledged before Syl. S. St. John on the same day, I would say: Mr. C. H. Elmendorf and myself have been to your place of residence on the above described property, also to the store of Messrs. Grant & Hartzell, as well as the Kearney National Bank, of Kearney, Nebraska, taking with us fifteen hundred dollars to pay the amount which would become due upon the execution of the deed by yourself for the above described property, also two notes, one dated December 17, 1887, for one thousand dollars and due at the Kearney National Bank (your banking house) on or before one year from date; one dated December 17, 1887, for one thousand

dollars, due at the Kearney National Bank in the city of Kearney (your banking house) on or before two years from date; also a mortgage duly executed and signed on the 17th day of December, 1887, to secure the two notes above described. I also took one deed drawn for you to execute for the above described property, thus complying in full with the terms of the agreement referred to above between yourself and F. A. Archibald of the part of the assignee.

"I will mail one copy of this letter to your address at the Kearney postoffice and leave one copy of it at your place of residence.          GEO. W. FRANK,

"Agent for owner of contract above referred to.

"P. S.—All the above papers, including the money, you will find at the Kearney National Bank (your bankers), in the city of Kearney, Nebraska, to be delivered to you upon the execution of the deed by you above referred to."

Fourth—That Frank on the same day deposited his check for $1,500, two notes, and a mortgage upon the property to secure the same, both executed by Will. J. Scoutt, together with a draft of a warranty deed for the premises from the appellee to Scoutt, with instructions to the bank to deliver the check, notes, and mortgage to the appellee upon the execution of the deed, which she failed to execute; that the appellant brought the money and securities into court, and offers the same to the appellee upon her fulfilling the terms of the contract; that since December 17, 1887, the premises have been leased to the present occupants, Theodore N. Hartzell and J. F. Wheelock, who are made defendants, and who have paid the appellee a monthly rent, the amount not known, which the appellant is entitled to receive since December 17, 1887.

The appellant asks that Gibbs be enjoined from conveying or incumbering the property, and that Hartzell and Wheelock be enjoined from paying further rents therefor. On April 27, 1888, injunction against defendants was granted as prayed in the plaintiff's petition.

On May 20, 1888, the appellee answered, setting up, in substance, that she objected to the specific performance of the contract on the grounds:

"1. That the contract was obtained by fraud and undue influence while the defendant was sick, and feeble, and incompetent to contract.

"2. That the contract was not fair, just, or reasonable.

"3. That the letter signed George W. Frank, agent for the owner of contract, was not a sufficient 'request in writing' within the meaning of the contract.

"4. That the deposit of a check and notes of Mr. Scoutt, in the bank, was not a sufficient offer or performance on the part of plaintiff.

"5. That the contract was one involving personal trust and was not assignable before acceptance."

The appellant replied, denying each allegation in the answer set up as a defense.

There was a trial to the court, without a jury, and the court held:

"1. That five dollars, the sum paid by Archibald to the defendant as a consideration of the option, was unfair and inequitable, and while the contract was not obtained by means of fraudulent representations, or by undue influence over a person of feeble mind, that it was nevertheless a bad bargain that a court of equity is not bound to enforce and should not enforce.

"2. The court further found that by the contract made the Archibald mentioned in the plaintiff's petition was to elect whether he should accept the property at the price named within five months and to so notify the defendant in writing; that he never did so elect to purchase the property, never did notify the defendant in writing of such election, and never did pay the defendant any part of the purchase price agreed upon, and has not complied with the terms of the contract made; that the notes offered were not the obligations of the said Archibald and that the defend-

ant was not bound to accept them.   Judgment for the de-
fendant dismissing petition.   Costs taxed to plaintiff."

From the judgment and finding of the court the plaint-
iff appealed.

It is argued by counsel, as the predicate of the appellee,
that to enforce the specific performance of the appellant's
option of purchase, the contract as to her must be found
to have been perfectly fair, equal and just in its terms and
in its circumstances, which, it is contended, this contract
was not and therefore should not be enforced. (Pom., Eq.
Jur., sec. 1405.)

The court below found from the evidence that, "while
the contract was not obtained by means of fraudulent rep-
resentations, or by undue influence over a person of feeble
mind, that it was, nevertheless, a bad bargain that a court
of equity is not bound to enforce, and should not enforce."
There is then no inquiry to be made as to the allegations
of fraud and undue influence towards the sick, feeble, and
incompetent appellee.   The court below found otherwise,
and we shall accept that fact as substantial.   Her self-
possession and capacity to manage her own pecuniary
affairs appear in sharp contrast to the allegations of incom-
petency.   However bad her bargain may have been deemed
to be, we are not left, as to its quality and value, to mere
speculation and conjecture.   The parties, themselves, con-
cluded the bargain after taking due time for reflection, and
fixed the price of the property at $3,500.   Five witnesses
for the appellant concurred in this estimate.   One laid the
value of it at $3,750.   Three witnesses for the appellee
considered it worth from $3,500 to $4,000, and two others
went as high as $4,500.   Another witness thought he
would pay for it $4,000, less the value of the improve-
ments, and two witnesses valued the improvements at
$1,500.   All of this evidence was from real estate dealers
in Kearney, who had made no serious offer of purchase.
The original second party to the contract received from the

33

appellant only an advance of $175 on his option.    It does not appear to have been of sufficient prospective value to have brought a higher price from any of the real estate dealers who testified as to its value.    While real estate was then the subject of exchange in Kearney there was no contemporaneous sale of like property tending to prove this sale as a bad bargain which a court of equity should not enforce.    But the evidence tends clearly to show that the appellee's bargain was not a bad one in the sense of being foolish, stupid, wasteful, or improvident on her part.    If the property was, for any personal reason, endeared to her beyond its commercial value, that fact was to be considered by her alone, before voluntarily entering into a written contract for the sale of it.    Nor does it appear that the price, $3,500, was inadequate or unreasonable, or so far below any speculative appraisement of the property that the bargain for its sale was perverse to that degree that a court of equity should not enforce it.    Under the contract, there was offered her ample security for the deferred payments, aside from a vendor's lien which was fully published by the acknowledgment and recording of the contract.    That record was public notice that the vendor's lien attached for the deferred payments on the property and the accruing interest.    While it is true that there was no provision for the notes and mortgage offered, yet, still, what other device, as security, could the appellee have claimed?

The appellee received, and still holds, the sum of $5 for this option of purchase, as consideration for the contract. As to the question of adequacy, one dollar would have been a sufficient sum, if mutually agreed upon; while the nature of the transaction was such that no money need to have been passed to render the contract legal and binding upon the parties.    The requisite consideration to the vendor was the agreement to purchase at a time certain, and pay the price agreed upon.    It created that benefit to her advantage, sufficient to support the contract.

It was held in *Blake's Case*, 7 Ia., 46, that " Each party to a contract may ordinarily exercise his own discretion as to the adequacy of the consideration; and if the agreement be made *bona fide* it matters not how insignificant the benefit may apparently be to the promisor, or slight the inconvenience or damage to the promisee, provided it be susceptible of legal estimation. Where the inadequacy of consideration is so gross as to create a presumption of fraud, the contract thereon will not be enforced; but it is the *fraud* involved, and not the inadequacy of the consideration, which tends to invalidate the contract."

We have found no fraud in the present transaction. The rule cited is, therefore, applicable in this instance, and is supported by recognized authority. Bishop lays it down as to contracts, and therein, sec. 45, that " Where an exact sum of money is given or to be given by the one party in return for something not money by the other, or where the thing on neither side is money, a court of law, and commonly a court of equity, will not interfere with their estimates of value, but will hold the contract good though the judge or jury should deem the value to be greatly more or less than the parties did. Yet inadequacy of value may be strong evidence of fraud, should that question be raised, or it may suggest fraud; and in a gross case it may be the controlling circumstance in establishing the fraud. So, on an appeal to the discretion of the court in a bill for specific performance, this relief will be withheld, not simply where the price is greater or less than the court would deem adequate, but where it is so much greater or less as to render the bargain unconscionable or its enforcement unjust. Upon which question there are some distinctions, and perhaps differences of judicial opinion,"—adds the commentator.

We have already seen that neither alternative, inadequate price, nor unconscionable bargain was established in this case. Such distinctions and differences of judicial opin-

ion as may have been held, limiting the remedy for those reasons, are not deemed of importance to reconcile here.

The question remains, and upon which depends the right of the appellant to maintain his action, Was the contract assignable? It is contended by counsel for the appellee that it was only assignable by the original party to it first accepting the option and becoming personally responsible to the vendor for the purchase money; that it was a contract involving a personal trust, and a degree of confidence which could not be subrogated to another. In support of this view is cited the decision in *Newton's Case*, 11 R. I., 390: "The defendant made his bond to J. S., conditioned that he might at his own option, within seven years, purchase certain real estate of defendant upon paying $800. J. S. dying three years before the expiration of the option, without having availed himself of it, it was held, that the option was neither a chose in action nor a transmissible right, but a personal privilege which lapsed upon the death of J. S., the sole beneficiary." The court said: "The privilege did not in express terms extend to the heirs or legal representatives of J. S., who brought the action, and, therefore, if it is passed to them, it was either as a chose in action, or a transmissible right of property, which it was not, for the want of election under the option, by the death of one of the parties, which freed both of the obligations of the contract." These facts defeat all the supposed analogy of the precedent with the present case. Here there is an expressed provision "that all the covenants and agreements shall extend to and be obligatory upon the heirs, executors, administrators, and assigns of the respective parties;" in the precedent it is wanting.

The second case cited by counsel, *The Arkansas Valley Smelting Co. v. Belding Mining Co.*, 8 Sup. Court Reporter [Col.], 1308, was brought on a contract of the defendant to deliver 10,000 tons of carbonate lead ore to Billing & Eilers, assigned to the plaintiff, with certain conditions

that the assignors, as mining experts and ore reducers, were obliged to execute. The court held that the contract was personal in its nature, and that the plaintiff, as assignee, could not compel the delivery of the ore. This example bears no relation to the present controversy, and is without significance as an argument in the case.

On the other hand, it is contended that courts of equity ought to take notice of the assignments of property and enforce the equitable rights of parties to just transactions in cases where assignments are not recognized at law as effectual to convey title. Authority is cited, "That courts of equity have long since totally disregarded this nicety, and accordingly give effect to assignments of trust and possibilities of trusts and contingent interests and expectancies, whether they are in real or personal estate, as well as to assignments of choses in action. Every such assignment is considered, in equity, as in its nature amounting to a declaration of trust and to an agreement to permit the assignee to make use of the name of the assignor in order to recover the debt or reduce the property into possession." (Story, Eq. Juris., sec. 1040.)

A later author has said: "Unless the contract calls for personal services, or which depend upon the learning, skill, solvency, or other personal quality of the party, or is fiduciary in its nature, it may be assigned by the vendee or the party in analogous position. This class of assignable agreements includes all ordinary contracts for the sale or leasing of land or personal property. The assignee may then sue in his own name to compel the specific performance of the contract." (Pomeroy, Spec. Perf. of Contracts, sec. 487.)

It is admitted that, under the rule of this authority, an advocate, a surgeon, a chemist, an architect, a farrier, a mineralogist, or a technologist could not substitute personal services, under contract, by assignment; but it is equally clear that the rule does not exclude the contracts of

brokers and dealers in real estate. The authority cited has long been in the library of courts, and not without use and sanction.

In *Wagner v. Cheney*, 16 Neb., 202, it was held "That a condition in a contract for the sale of real estate requiring the assent of the vendor to the assignment of the same, but not providing for a penalty or forfeiture of the contract, will not defeat an action for specific performance by an assignee who has fully performed." The plaintiff was the second assignee, and third in possession, and the terms of the contract had been kept whole by each. The defendant admitted the premises, but set up that the contract provided that no assignment of the premises should be valid without his written consent indorsed on the contract, which had not been given. Judge MAXWELL, in the opinion, said: "Where a penalty or forfeiture is assigned as a security to enforce the principal obligation, it has performed its purpose when the party insisting upon the penalty is fully paid his money or damages. The defendant has been paid according to the terms of the contract. While receiving the plaintiff's money for the land, thus admitting the validity of the contract, he objects, for the reason that he has not given his assent to the plaintiff's assignment. He has the notes of the original purchaser; the plaintiff offers to secure them by mortgage on the land. This is sufficient, and the answer constitutes no defense to the action."

The conditions and reasoning thus presented are not so remote in analogy from the case at bar that the same rule should not be applied, that the assignee, having complied with the terms of the contract, takes all the rights of the purchaser. And how has he complied with the contract? By notice in writing of his acceptance of its terms; by a tender of the cash payment due; by an offer of promissory notes for the amounts of the deferred payments, made secure by a mortgage on the premises. These acts, supplemental to those of the purchaser, are consubstantial with all the

elements of a contract for the purchase of real property to be enforced as a right. We hold that he had thus completed what, in law, was required to be done to be subrogated to the purchaser's rights. This view is found to be in accordance with various precedents under doctrine recognized in English courts from a remote period.

In *Crosbie v. Tooke*, 7 Eng. Ch. Rep., 431, it was held that " It is no defense to a bill, filed against a landlord for specific performance of an agreement for a farming lease, by one to whom the benefit of the agreement had been assigned, that the party with whom the landlord had contracted, one Bickmore, had become insolvent, provided the assignee was solvent, and in condition to enter into the usual covenants, and there is no evidence that the contract was entered into upon considerations personal to the assignor." Injunction resting against the defendant's action of ejectment to oust the plaintiff, the vice chancellor, on hearing, was of the opinion that the defendant was released from his contract by the insolvency of Bickmore before any lease had been executed to him, and therefore dissolved the injunction. On a motion for appeal by plaintiff, and that the vice chancellor's order might be discharged, and the injunction revived, it was contended by the solicitor general that the subsequent insolvency of the original lessee was no valid reason why the defendant should not be compelled to the specific performance of his contract for the benefit of the plaintiff, whose solvency was not disputed, and who claimed by a title derived from that lessee. If a lease had been executed to him, it must have been in the common form, without a covenant against alienation, as no such stipulation was found in the agreement. As the lease to be granted would have been assignable, the contract itself must be equally so. If the lease had been immediately executed the defendant would have had the covenant of an insolvent for rent, which would have been worthless, but would now have, in the plaintiff, a responsible and solvent

tenant, and would stand in a better situation than if the
lease had been made to the original contractor.   Sir Ed-
ward Sugden, *contra*, insisted, that, as the defendant's agree-
ment with Bickmore contained no authority to assign, it
was of a purely personal character; and so long as matters
rested in *fieri*, yet to be settled, that character continued.
Bickmore, it was admitted, was not in condition to call for
specific performance, inasmuch as his insolvency had dis-
abled him from executing his part of the agreement, and
the plaintiff, who claimed by assignment from him, could
have no better equity than his assignor.   There was no
mutuality between these parties.   If the plaintiff, notwith-
standing Bickmore's assignment, had chosen to repudiate
the contract, the defendant could never have compelled him
to complete it; nor could the execution of a lease, in which
were inserted the usual covenants by the plaintiff for pay-
ment of the rent be, with any propriety of speech, described
as a specific performance of the defendant's original contract
with Bickmore, which the present bill pretended to enforce.
The insolvency of Bickmore, therefore, must be considered,
as the vice chancellor had considered it, to operate as deter-
mining the agreement altogether.   The lord chancellor
Brougham held, that there was nothing in the dealing of
the parties to the instrument itself to justify the contention
that this was a contract made by the landlord specially and
personally with Bickmore; that he had been unable to dis-
cover anything which should differ the interest here con-
tracted to be given from that under which any tenant
would have under a common farming lease.   The case is
therefore left to rest upon the ground upon which it was
decided in the court below; and I am clearly of the opinion
that the circumstances of the party who originally con-
tracted having assigned his interest cannot be taken into con-
sideration, the assignee being admitted to be a person in
solvent circumstances, and able to enter into the covenants
of the proposed lease, and that the insolvency of the as-

signor cannot be set up with effect for the purpose of re-leasing the defendant from the specific performance of his agreement. The vice chancellor's order was discharged, and the injunction was revived. Afterwards, upon a hearing at the rolls, the defendant abandoned the objection upon the ground of the original tenant's insolvency, and a decree was made according to the prayer of the bill.

In *Morgan v. Rhodes*, Id., 435, Lord Brougham again held, "Where a landlord agrees to grant a lease to A, his executors, administrators, and assigns, on certain conditions, and A assigns his interest in the contract to B, and becomes bankrupt, B on performing the conditions has a right to enforce the agreement specifically, notwithstanding his assignor's bankruptcy; and this right is not affected by a proviso that in case of the bankruptcy of A the landlord shall have power to re-enter and sell the benefit of the contract and the premises, and hold the proceeds, subject to his own claims, for the use of A's estate."

In *Maughlin v. Perry*, 35 Md., 352, W., on March 9, 1864, rented certain premises, of which he was owner, to H. for three years, renewable for like period, agreeing for himself, his heirs and assigns, to sell and convey the premises to H., his heirs and assigns, for $1,500 at any time before the expiration of the lease. It was further agreed that W. should give H. at least three months' notice in writing, before the expiration of the lease, of his intention not to renew, and in default of such notice, the lease was to continue for another term of three years, as also the privilege to purchase the property. On March 15, 1867, W. contracted to sell the property to M. for $1,600, payable in installments, which were paid as they became due. W. died intestate before the termination of the lease, which by its provisions had become renewed for three years. The rights of H. by *mesne* assignments became vested in the appellees. On a bill filed March 3, 1870, six days before the expiration of the lease, by the

appellees against the appellant, and the administrator of W., alleging that the complainants were ready to pay the stipulated sum, and desired to have a conveyance of the property, and asking for the specific performance of the agreement, it was held that the filing of the bill, and offer to pay the price stipulated, was such a substantial compliance on the part of the assignees of H. with the terms of the covenant as to entitle them to have it specifically executed.

In *Owen v. Frink*, 24 Cal., 171, it was held that if A contracts with B for the conveyance of a tract of land whereby B has the right of conveyance of an entire tract, and afterwards assigns to two or more persons, giving to each a separate conveyance of his equitable title to separate parcels of the land, the assignees of B may maintain a joint action against A for a specific performance of the contract. It was also held that a contract for the conveyance of land, to be paid for either in labor or money at the purchaser's option, may be enforced in equity if the purchaser elects to pay in money and makes a tender of the amount due.

In *Gaston v. Plum et al.*, 14 Conn., 343: A, being the owner of land supposed to contain minerals, on January 21, 1839, by a written instrument granted liberty to B to dig or mine said land, and carry away any mineral discovered, within one year; and B on May 11, 1839, by writing signed by him, on the back of the instrument, assigned to C all his interest, right, and privilege in the land therein mentioned, with the appurtenances, and all benefit and advantage derivable from such instrument; upon which B brought a bill in chancery against A and others for a specific performance of the agreement. It was held, first, that the agreement was not of a fiduciary character, or in the nature of a personal confidence, so as to be incapable of assignment; nor, second, was the interest of B of that uncertain and contingent description that it could

not on that account be transferred; and consequently B having parted with all his interest in the subject of the bill, it was, for that reason, dismissed.

In *Fitzhugh et al. v. Smith*, 62 Ill., 486, "Where the complainants in a bill for specific performance succeeded to the rights of the original vendee, by purchase of his interest in real estate at a judicial sale, and the vendee's contract of purchase had not been recorded so as to give notice of its terms, held, that it was not necessary for the complainants, before filing their bill, to make a formal tender of the precise sum due the vendor; that it was sufficient to offer to perform the contract when the vendor declines to recognize their right to a deed unless they pay him the money which he had loaned the vendee."

In *Perkins v. Hadsell*, 50 Ill., 216, it was held, if the owner of lands gives to another the option to select and purchase a lot at a stipulated price, on certain conditions that he shall make the selection within a given time, pay the taxes, improve the lot and pay the purchase money, upon the performance of which the owner agrees to convey, while he may, no doubt, at any time before his proposition is accepted by the other party selecting, entering upon, and commencing to improve the land, withdraw his offer, yet, after the other party has accepted the proposition, by doing all that he was required to do by its terms, it is then too late for the owner to recede, and he may be compelled, on a bill for specific performance, to convey the land. And in this case, the mutuality and the consideration for the agreement to convey, consist in the party having the option having actually done, upon the promise of the owner, what he required to have done, and it is immaterial that it was done without having entered into a previous undertaking to do it.

In *Corbus et al. v. Teed*, 69 Ill., 205, where the purchaser of land assigned his contract for a deed before payment, and the assignee neglected to make the payments,

held, that a tender of conveyance, preliminary to a bill for specific performance by the vendor, was properly made to the original purchaser; held, also, that the assignee of purchaser will have the right or option of completing the contract, and thereupon to insist upon a conveyance ·to himself.

In *House v. Dexter et al.*, 9 Mich., 246, it was held that "the heir at law of the vendee, and not the administrator, is the proper party complainant to a bill to compel the specific performance by the vendor of a contract for the conveyance of lands." ·

In *Miller v. Whittier et al.*, 32 Me., 203, it was held that "one, bound to convey land upon the performance by another of certain conditions, does, by purposely incapacitating himself to make the conveyance, exonerate the obligee from the performance of his conditions, prior to exhibiting a bill for special performance of contract."· Held, also, "that one who has assigned all his interest in a contract made to him, need not join with the assignee as a plaintiff in a bill for performance."

In *Currier v. Howard*, 14 Gray, 511, it was held that a contract in writing to convey land may be assigned by verbal agreement, and under the Massachusetts Statutes of 1853, C. 371, the assignee might enforce specific performance in his own name, in an action at law praying equitable relief.

Whether or not the minor distinctions to be found in the examples cited differ materially from the minor conditions of the present case, the rule is broadly maintained from Maine to California, that option contracts for the purchase of real estate are, in law, assignable to third parties, who may enforce the terms by action in their own name. This established, we hold that the court below erred in finding the consideration of the option unfair and inequitable, and that the contract of the appellee was a bad bargain, not to be enforced in a court of equity.

Adversely to this judgment, we have found that the notice in writing to the appellee, and the election of purchase by the appellant, were timely and sufficient; that the tender of cash payment and the offer of the promissory notes, secured by mortgage, for the deferred payments were ample security, and was such a compliance with the contract as entitled the appellant to an immediate and full conveyance of the title to the premises.

The judgment of the district court is reversed and judgment for the specific performance of the contract in accordance with the prayer of the plaintiff's petition, and upon the terms and conditions therein, will be entered in this court.

JUDGMENT ACCORDINGLY.

THE other judges concur.