AMERICAN SMELTING & REFINING CO. v. BUNKER HILL & SULLIVAN MINING & CONCENTRATING CO.

(District Court, D. Oregon. January 14, 1918.)

No. 7555.

1. MINES AND MINERALS ⟨⟩⟩83—SMELTER CONTRACTS—CONSTRUCTION.
    Where a mining company agreed to sell and a smelting company to purchase all the output of the former's mines which shall have a lead assay ranging from .30 per cent. to 75 per cent., and there were separate agreements as to low and high grade ores, the contract must, there being a stipulation that the ores should be of approximately the same yearly analysis and lead assay as the shipments made by the mining company during previous years, be construed as including only the average ores of the mining company and not allowing it to work its output into high or low grade to suit its convenience; this being particularly true, as that construction was long followed by the parties.

2. MINES AND MINERALS ⟨⟩⟩83—SMELTER CONTRACTS—CONSTRUCTION.
    Where a contract between a mining company and a smelter company providing for purchase by the latter and sale by the former of its ores of certain percentages declared that such ores should be shipped to the smelting company's smelter at a specified point, and it appeared that such clause was inserted in the contract when prior agreements were consolidated, and other paragraphs of the contract clearly disclosed that there

was no agreement that the ores should in all cases be shipped to the designated point, the contract cannot be construed as requiring shipments thereto, particularly as the mining company long acquiesced in the diversion of the shipments to other points.

3. INJUNCTION ⟪136(3)—PRELIMINARY INJUNCTIONS—ISSUANCE.

A preliminary injunction may issue to maintain the status quo, where the questions of law or fact to be ultimately determined are grave and difficult, and injury to the moving party will be great if denied, while loss to the opposing party will be comparatively small, and hence defendant may, by preliminary injunction, be restrained from disposing of its ores to any person or corporation other than complainant pending a suit for specific performance of a contract to sell such ores to complainant, where a breach of the contract would greatly damage complainant.

4. INJUNCTION ⟪135—PRELIMINARY INJUNCTION—DISCRETION.

Along with the fixed rules of law as to the issuance of a preliminary injunction, it is essential that the court exercise sound discretion in view of the attendant facts and conditions.

5. SPECIFIC PERFORMANCE ⟪68—CONTRACTS ENFORCEABLE—PERSONALTY.

A suit will lie for specific performance of a contract respecting personalty, where the suitor has no plain, speedy, adequate, and complete remedy at law.

6. SPECIFIC PERFORMANCE ⟪69—CONTRACTS—PERSONALTY.

When ores produced by the defendant mining company have a peculiar value for smelting purposes and are not readily obtainable elsewhere, so that it would be practically impossible to measure their value in determining the loss a smelting company would sustain were it not able to obtain them under a contract with defendant, specific performance of the contract may be decreed.

7. SPECIFIC PERFORMANCE ⟪75—CONTRACTS—AGREEMENTS SUSCEPTIBLE.

Where a mining company agreed to dispose of certain ores to a smelting company during a term of years and to operate all its mines, specific performance of the contract may be decreed, it not appearing that such decree would necessitate supervisory control by the court in requiring performance of the contract, this being particularly true, as the contract itself provided for submission of controversies as to disputes over assays to umpires specified.

8. MINES AND MINERALS ⟪83—SMELTER CONTRACTS—CONSTRUCTION.

A mining company and a smelter company, having agreed to sell and purchase certain ores, entered into a supplemental agreement, declaring that in case smelting companies other than one designated should make rates that the smelting company did not desire to meet, then the mining company might accept such rates, and might ship to other smelters after giving 60 days' notice, but on termination of such arrangements the smelting company should continue to buy in pursuance of the principal contract, and that the smelting company should have the right to resume the purchase of any product so diverted by giving 60 days' notice to the mining company of its willingness to meet the terms of other smelters. Another paragraph of the supplemental agreement declared that the terms governing the price should be those made by a designated smelter corporation to a majority of ore shippers in the district, unless such corporation should go out of existence, or cease to purchase a majority of those ores, in which event the terms given by other smelting companies for a majority of the ores purchased in that district should govern. *Held* that, as all the terms of the agreement should be construed together, the supplemental agreement must be construed as providing, in event the designated corporation should go out of existence or cease to purchase a majority of the ores of the district, that the mining company should have, in case other smelters purchasing a majority of the ores should fix terms

⟪For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

that the smelting company did not desire to meet, the option to accept them and the smelting company the option to subsequently meet those terms.

9. SPECIFIC PERFORMANCE ⬡═⟹59—CONTRACTS—OPTION.
     Specific performance of a contract to sell and purchase ores cannot be denied because it contained an option feature; the contingency on which the option might be invoked being extremely remote.

10. SPECIFIC PERFORMANCE ⬡═⟹57—CONTRACTS—OPTION.
     Though a contract between a mining company and a smelting company for the sale and purchase of ores was optional as to high and low grade ores, specific performance of the agreement to sell average ores may be enforced by the smelting company.

11. ASSIGNMENTS ⬡═⟹18—CONTRACTS.
     Ordinarily a contract is assignable unless the assignment is forbidden by statute or by the terms of the contract itself.

12. ASSIGNMENTS ⬡═⟹19—CONTRACTS ASSIGNABLE—PERSONAL NATURE.
     Contracts involving relations of personal confidence or for personal service are not assignable, but the question whether a contract falls within the exception must depend upon the intention of the parties and the nature of the contract itself.

13. ASSIGNMENTS ⬡═⟹18—CONTRACTS—VALIDITY.
     Where defendant, when it contracted to sell ores to a smelter company, recognized the probabilities that the contract would be assigned to the parent or principal company which had acquired the stock of the smelter company, and the contract itself provided that deliveries of ores by the mining company should be made to any smelting plant owned by the company, its successors or assigns, and that the agreement should be binding and inure to the benefit of the successors and assigns of the respective parties, the contract is assignable; it being apparent that the parties so intended.

14. SPECIFIC PERFORMANCE ⬡═⟹20—ASSIGNMENT—EFFECT.
     Where a contract for the sale of ores by a mining company and their purchase by a smelting company provided for assignment, the assignment of the contract did not relieve the assignor of liability so as to prevent specific performance.

15. SPECIFIC PERFORMANCE ⬡═⟹51—CONTRACT—REASONABLENESS.
     Where a contract between a smelting company and defendant provided that the price paid for ores should be that paid to a majority of the ore shippers in the district, by complainant smelting company to which the contract was assigned, specific performance of the contract after assignment cannot be denied because complainant in a sense fixed the price, for it could not act arbitrarily, but was governed by the price paid certain other ore shippers.

In Equity. Bill by the American Smelting & Refining Company, a corporation, against the Bunker Hill & Sullivan Mining & Concentrating Company, a corporation. On motion for preliminary injunction. Preliminary injunction granted.

Carey & Kerr, of Portland, Or. (George Donworth, of Seattle, Wash., F. H. Brownell, of New York City, F. W. Lehmann, of St. Louis, Mo., and Root, Clark, Buckner & Howland, of New York City, of counsel), for plaintiff.

Myron A. Folsom, of San Francisco, Cal. (Curtis H. Lindley, of San Francisco, Cal., George F. Holman, of Portland, Or., and George Hatfield, of San Francisco, Cal., of counsel), for defendant.

⬡═⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

WOLVERTON, District Judge. The purpose of this suit is for specific performance and to restrain the defendant company (herein to be called the Mining Company) from selling or delivering any of its lead-silver ores, concentrates, or slimes to any person or corporation other than the plaintiff (to be called the A. S. & R. Company herein). The present inquiry is whether a preliminary injunction shall issue pending the final determination of the cause.

It is only necessary at this time to get an understanding of those features of the agreement between the Mining Company and the Tacoma Smelting Company (to be called the Smelting Company) that seem to be controlling where the parties are not in accord. These features must be construed in the light of the events attending the consummation of the agreement which show the motives that induced it and the purposes which it was intended to subserve. In this we may be aided somewhat by the treatment accorded by the parties themselves to particular provisions.

The Smelting Company has a capital stock of 5,000 shares, of the par value of $100 per share. On March 20, 1905, it entered into and had contracts with the Alaska-Treadwell Gold Mining Company, Alaska-Mexican Gold Mining Company, and Alaska United Gold Mining Company, and with the Mining Company, the defendant herein, previously signed, for the purchase of ores from each of the several companies, for smelting purposes. The plaintiff company had also at the same time a contract with the Mining Company for the purchase of some of its ores. All these mining companies, either by direct holding or through their stockholders, were owners of shares of stock in the Smelting Company, the defendant Mining Company being the owner of 1,567 shares. The A. S. & R. Company, acting through Bernard M. Baruch, effected a purchase of the whole of the capital stock of the Smelting Company, at a price exceeding $5,000,000. The stock was transferred to the American Smelters Securities Company, a New Jersey corporation, of the voting stock of which the A. S. & R. Company held, and now holds a controlling interest, so that it dominates the action of such New Jersey corporation. The defendant Mining Company was aware of all these relationships.

On March 20, 1905, the Mining Company entered into an agreement with the Smelting Company, which action was within the contemplation of the Baruch purchase, whereby the former agreed to sell and the latter to purchase all the lead-silver ores, slimes, and concentrates mined from all the properties owned or leased by the Mining Company, delivered f. o. b. cars at or near Wardner, Idaho, at sales prices agreed upon, with certain stipulated deductions. It was stipulated that the products to be delivered should be of a lead assay of between 30 per cent. and 75 per cent., and that the average product should be of approximately the same yearly average analysis and lead assay as the shipments made from the mines during any year of the 12 years immediately preceding the date of the agreement, unless the Smelting Company should give its written consent to the shipment to it of products varying from that standard in analysis and in lead assay, as to which it was given the option to purchase at the best going market rates

and terms. For the purpose of determining the net sales prices, the contract provides that the values of the contents of the product shall be ascertained as follows (omitting silver and gold): "Lead. The value of ninety per centum of the lead contents at ninety per centum of the average sales price in the city of New York for common desilverized domestic lead, in lots of fifty tons or more, for shipment within thirty days, as made by the American Smelting & Refining Company, during the week preceding the week of shipment of the lot in question" (subsequently changed, by agreement of February 28, 1907, to read "on the date of shipment of the ore"), whenever the selling price does not exceed $4.10 per one hundred pounds, and when the price exceeds that sum, 90 per cent. of $4.10 and one-half of the excess.

From such values, deductions are to be made as follows: "From the value of each lot of ore, slimes, or concentrates (not containing less than a daily average of 27 tons, nor more than a daily average of 37 tons of metallic lead, the tonnage between the minimum and the maximum to be entirely at the option of the Mining Company), shipped to the Smelting Company's smelter at Tacoma, Washington, there shall be deducted a freight and treatment charge, when the lead quotation is $4.35 per hundred pounds or over, of $15.75, and, when the lead quotation is less than $4.35 per 100 pounds, of $16 per net dry ton f. o. b. cars at or near Wardner when the gross value is not over $60 per ton, said value to be arrived at by counting silver at New York quotations and lead at $3.50 per hundred pounds. If, however, any ore or concentrates should contain less than 53 per cent. lead, a deduction is to be made from the freight and treatment charge of one-half cent for each pound of lead under 53 per cent.;" but should the ore or concentrates contain more than 53 per cent. lead, there shall be added to the freight and treatment charge one-half cent per pound above that percentage. It is further provided that: "The Mining Company, in making shipments, may exercise its option as to lead contents of ores, slimes, and concentrates, wherever the same may be shipped." This is known as the differential clause. From the value of each lot of products shipped, in addition to above-mentioned Tacoma shipments, except as provided in article 1, "there shall be deducted a freight and treatment allowance, figured on dry weight, equal (without regard to the actual destination of the ores shipped under this contract) to the sum of the tariff railway charge for freight from the mines of the Mining Company to Pueblo or Denver," plus an allowance for smelting of $8 per ton.

The fourth paragraph provides that deliveries shall be made to any smelting plant owned by the Smelting Company, its successors or assigns. Should the Mining Company, however, desire to ship greater amounts of ore than the smelting plant or plants of the Smelting Company can conveniently smelt, the Smelting Company shall have the right to sell or divert such excess shipments, at same rates, prices, and conditions as in the agreement provided for. Then follow provisions for the payment for the ores.

By the eighth article, the provisions are made to extend for a period of 25 years from February 1, 1905, except as subsequently provided.

By the eleventh paragraph it is stipulated that:

"This agreement shall be binding upon and inure to the benefit of the successors and assigns of the respective parties hereto, and all its provisions relating to the sale of ore shall, as to the Mining Company, be deemed to be and considered as a covenant running with the land."

By the twelfth paragraph, the terms of the agreement were to continue in any event until June 1, 1910, and it is further stipulated that thereafter the Mining Company shall, during the remainder of the period, receive at least the same terms, and, in addition thereto, shall receive the benefit of any and all direct and indirect reductions in charges, and any and all direct and indirect concessions in methods of determining values, in methods of per centum deductions, in methods of making quotations, and in any other way whatsoever, that may be made at any time after the date of the contract by the A. S. & R. Company, and be in effect after June 1, 1910, to a majority of Cœur d'Alene shippers.

The agreement was ratified by the stockholders of the Mining Company.

By a supplemental agreement, made on the same day between the parties, the Mining Company undertook to terminate its ore contracts, which it then had, with the Pennsylvania Smelting Company, and the Ohio & Colorado Smelting Company, and, on the other hand, the Smelting Company agreed to use its best endeavors to procure the cancellation of a contract then in force between the Selby Smelting & Lead Company and the Mining Company.

The terms of section 12 of the agreement were modified by a second supplemental agreement, whereby it is stipulated that, in case smelting companies other than the A. S. & R. Company make rates that the Smelting Company does not desire to meet, then the Mining Company may accept such rates, and may ship to such other smelters after giving 60 days' notice to the Smelting Company, but that, on the termination of such arrangements, the Smelting Company agrees to continue to buy in pursuance of the principal contract. It was further agreed that the Smelting Company should have the right to resume the purchase of any products so diverted by giving 60 days' notice to the Mining Company of its willingness to meet the terms of the other smelters for the period for which the other smelters had offered to contract.

And it was also further agreed that the terms that are to govern under clause 12, unless the A. S. & R. Company shall cease to do business or to purchase a majority of the Cœur d'Alene ores, shall be those made by the A. S. & R. Company to a majority of Cœur d'Alene shippers, and that, in determining such majority, the Mining Company's ores and the ores of mines owned by the Smelting Company shall be included; but in case the A. S. & R. Company shall cease to purchase a majority of the tonnage, then the terms given by the other smelting companies for a majority of the Cœur d'Alene ores, after excluding the ores produced by mines of the Mining Company and mines owned and controlled by any smelting company, shall govern, provided the same amounts to an average of at least 1,000 tons per month; and it

is stipulated that in any event the Mining Company is to receive as good terms and prices as are granted to mines owned directly or indirectly by the A. S. & R. Company.

On November 17, 1910, the parties entered into a further supplemental agreement, which was to apply from June 1, 1910, to June 1, 1915, whereby it was agreed that in addition to the terms of payment stipulated for in the principal agreement, the Mining Company should receive 85 cents per ton for each ton of ore delivered containing a lead assay of between 30 and 75 per cent. By the fourth paragraph, it was further stipulated that the Smelting Company should not assign nor transfer the said original or supplemental contract prior to November 17, 1915, without the written consent of the Mining Company.

Prior to the date of the contract here in controversy, the Mining Company had contracts for smelting with the following smelting companies: Tacoma; Ohio & Colorado; Pennsylvania; Selby; and American Smelting & Refining Company, the plaintiff herein. The present agreement superseded, as was the intention and purpose of the parties, the contract with the Tacoma Company. The first supplemental agreement provides for a termination of the contracts with the three companies, as aforenamed, following the Tacoma. And it was further the purpose of the present agreement to wholly supersede the agreement with the A. S. & R. Company. So that, in the end, the Smelting Company acquired the right to purchase all the ores of the Mining Company. That such an arrangement, to culminate in the agreement that was finally entered into between the Smelting Company and the Mining Company, superseding all other agreements on the part of the Mining Company for disposing of its ores, was in the minds of the parties concerned, including the Mining Company and the A. S. & R. Company, at the time Baruch consummated the purchase of the stock of the Smelting Company, can scarcely be questioned. Whatever part the Mining Company may have had in the consummation of the Baruch enterprise to acquire, in the interest of the A. S. & R. Company, the corporate stock of the Smelting Company, it surely was wholly cognizant of what was taking place, and was acting in pursuance of the plan, to the purpose of finally obtaining from the Smelting Company an agreement for disposing of the major part of its ores, if not the entire output. The Mining Company knew that the hand of the A. S. & R. Company was in the enterprise, and that it was really the controlling factor in bringing about the agreement of the Smelting Company of March 20, 1905, to purchase the Mining Company's ores.

[1] As I construe the agreement, it is that the Mining Company shall sell, and the Smelting Company shall purchase, all the output of the mines which shall have a lead assay ranging from 30 per cent. to 75 per cent. By way of further specification, it is stipulated that the average product shall be of approximately the same yearly analysis and lead assay as the shipments made during any year of the 12 preceding years. The purpose, no doubt, of this latter stipulation was to secure, as nearly as practicable, a uniform product, one which Mr. Newhouse thinks would average around 53 per cent. lead assay.

Prior to the date of the agreement, by far the greater proportion of the output of the mine had been shipped by the Mining Company in a proportion containing between 30 per cent. and 75 per cent. lead; and it is asserted by Mr. Rust, who was until 1916 manager of the smelter, that there never was a time until the later controversy that the Mining Company claimed the right of so compounding its products as to reduce to low grade or increase to high grade beyond that resulting from the usual and normal operations of the mining and milling plants as they had theretofore and were then being carried on.   Mr. Bradley disagrees with this view, and asserts that:

"The idea of providing for the same yearly average analysis and lead assay as the ore shipped in any 1 year of the preceding 12 was to be sure of being able to deliver to the smelter any possible mixtures of ore.   That is, if an ore carrying 30 per cent. of lead and under could not be sold locally and if an ore carrying 75 per cent. in lead and over could not be sold at a distance, then these two products could be mixed to fit the average of any 1 of 12 preceding years."

Thus it will be seen that diametrically opposed views as to the meaning of the paragraph in question are maintained.   The view dictated by reason, however, is that, as the usual and normal product of the mine ranged between a lead assay of 30 per cent. and 75 per cent., which constituted by far the larger proportion of the output, it was, the intention of the parties, and is the intendment of the agreement, that the Mining Company shall sell and the Smelting Company shall purchase the whole of this product, the average analysis of which shall approximate the average of any 1 year of the 12 preceding years, and not that the Mining Company shall be privileged to work the output into a high or a low grade, to suit its convenience and purpose.

The clause under the head of "Deductions," extending to the Mining Company the exercise of its option as to lead contents of ores, etc., has relation only, as we shall see hereafter, to the Tacoma shipments, as to which a price differential is applicable.   Any other interpretation would defeat the primary and moving spirit of the agreement, namely, that the Mining Company should have a continuing and stable market for its normal and usual output, constituting the bulk thereof, and that the Smelting Company should have a dependable source of supply of a reasonably uniform commodity for the smelting operations of itself and its associate companies.

It was contemplated, however, and within the minds of the parties, that there would be some of the Mining Company's ores that would not, in the usual course of concentration, comport with the normal standard; that some of them would fall below the minimum of assay and some above the maximum comprising the normal grade; and as to these the parties concurred in a different contractual treatment.   The Smelting Company was accorded the option to purchase these products at the best going market rates and terms, and also any ores, slimes, and concentrates that might carry copper, zinc, or other metals of commercial value, the payment for which was not provided for in the agreement.   As to the meaning and intendment of this part of the agreement, Judge Lindley has given a very clear and lucid interpreta-

tion. Addressing a letter to Mr. Rust on the subject, of date March 7, 1906, he says:

"The Tacoma Company had an absolute right to and was required to take all ore, slimes and concentrates whose lead contents were not 30 per cent. and less nor 75 per cent. and more. The price to be paid for this product between the maximum and minimum was fixed by the contract. As to the product varying from the above analysis, the Tacoma Smelting Company had the option to purchase at 'best going market rates and terms,' and it is quite clear that until some notice was given of the exercise of this option the Bunker Hill Company had the right to deal with such product as it saw fit. It is also quite clear that you could not have been compelled to take any product of 30 per cent. and lower or 75 per cent. and higher. I understand that this interpretation of the contract is concurred in by Mr. Chickering, your counsel in this city and the counsel of the American Smelting & Refining Company in New York. To say that the spirit of the contract was that the Tacoma Smelter should have all the product of the mine regardless of the lead contents is to practically nullify the express letter of the instrument. I know of no rule of law which sanctions this method of interpretation."

The parties have since acted in pursuance of this interpretation until the coming on of the differences giving rise to the present controversy. Of these I will have more to say later.

[2] Referring to the provision in the agreement, under the head of "Deductions," which requires that from the value of each lot of products containing not less than a daily average of 27 tons, nor more than 37, of metallic lead shipped to the Smelting Company's smelter at Tacoma, there shall be deducted certain freight and treatment charges, with certain differentials for ore the lead assays of which range above or below 53 per cent., it is insisted that it is the intendment of the agreement that this ore shall be shipped to Tacoma, and that it constitutes a breach of the agreement to divert it elsewhere. That the parties did not so understand it is apparent from their disposition of these ores, for since entering into the agreement they have been diverted to suit the convenience of the Smelting Company to smelters of the A. S. & R. Company, with the knowledge of the Mining Company, and it was not until the present controversy arose that it was claimed it was obligatory upon the Smelting Company to receive this class of ore at Tacoma.

It is quite obvious, from a consideration of the history of the draft of this agreement, how the particular sentence "shipped to the Smelting Company's smelter at Tacoma" came to be written in in that way. By the previous agreement of May 31, 1904, known as "Exhibit F," the Smelting Company's entire purchase consisted of 27 tons minimum and 37 tons maximum of lead per day under the identical terms incorporated in the present agreement. The A. S. & R. Company's agreement, of date April 11, 1904, Exhibit G, was to purchase a minimum of 40 tons per day, on terms coinciding with the general terms of purchase of ores running from 30 per cent. to 75 per cent. under the present contract; and so, in formulating the present agreement, the parties have put it together from the two previous agreements, and the words above quoted were run in as descriptive of the particular shipments rather than as a condition obligatory. This construction is in harmony with the provisions of the fourth paragraph, while the one

contended for renders the two clauses repugnant. Another clause in the same paragraph supports this view. It reads:

"The Mining Company, in making shipments, may exercise its option as to lead contents of ores, slimes, and concentrates, wherever the same may be shipped."

Evidently the option as to the lead contents relates to the shipments of 27 to 37 tons daily, carrying the differentials as to price, and not to the general shipments of ore concentrates ranging between 30 per cent. and 75 per cent. lead assay, and the words "wherever the same may be shipped" are indicative of a mutual understanding that they may be shipped anywhere. This is borne out, not only by the context and arrangement, but by the manifest wording and language of the agreement. The price that the Mining Company is to receive for its normal and usual output, as well as for what are termed its Tacoma shipments, being fixed, it is obvious that it is a matter of no concern whatever to it where the ores may go for smelting purposes.

Other clauses of the agreement will receive attention later.

A controversy arose in 1910 with reference to the clauses under discussion, wherein it was claimed by the Mining Company that it should receive a higher rate for its normal ores. This resulted in the agreement of November 17, 1910, whereby the Smelting Company agreed to pay, in addition to the price agreed upon under the original contract, the sum of 85 cents per ton, to extend from June 1, 1910, to June 1, 1915. Since the latter date—I take it from statement of counsel for complainant—the Smelting Company has been paying the increased rate.

The ores not included by the normal grade have a different history. Those falling below 30 per cent. lead assay have been relatively small in amount, and not a great deal of dispute has arisen concerning them. As to those containing 75 per cent. lead assay and above, there has been considerable controversy. These controversies were adjusted from time to time in pursuance of Judge Lindley's interpretation of the agreement, and the parties continued in mutual accord concerning them until June 5, 1915, the date when the Smelting Company notified the Mining Company that after June 7th this particular grade of ore would be settled for on regular contract rate, namely, $16 treatment basis, and 90 per cent. of lead at 90 per cent. of New York quotations up to $4.10, plus one-half the excess above $4.10. No adjustment between the parties followed this notification. The Mining Company thereupon insisted that the Smelting Company receive the whole of the 37 tons of lead maximum shipment per day at Tacoma. This being refused, it declared that the Smelting Company had breached its agreement. Matters have so remained up to the present time; the Mining Company continuing its shipments of normal grade ores to smelters controlled by the A. S. & R. Company.

The Mining Company has recently constructed a smelter of its own, and though it has not yet diverted any of the ores agreed to be sold to the Smelting Company, except some of the high and low grade, it has threatened to do so, and there is no doubt that such is its pur-

pose, unless its obligations under the agreement prevent it from so doing. The agreement has been assigned by the Smelting Company to the A. S. & R. Company, the plaintiff.

[3] It is unnecessary to review the authorities respecting the conditions under which preliminary injunctions may issue. It is only essential that it appear that there is a probable right, and a probable danger that such right will be defeated without the immediate interposition of the court. The purpose of such injunctive relief is to maintain the status quo, and it will be granted wherever the questions of law or of fact to be ultimately determined are grave and difficult, and injury to the moving party will be immediate, certain, and great if denied, while loss or inconvenience to the opposing party will be comparatively small if granted. Sanitary Reduction Works v. California Reduction Co. (C. C.) 94 Fed. 693; Denver & Rio Grande R. Co. v. United States, 124 Fed. 156, 59 C. C. A. 579; Magruder v. Belle Fourche Valley Water Users' Ass'n, 219 Fed. 72, 135 C. C. A. 524.

[4] Along with fixed rules of law, there is need of a sound discretion to be exercised at all times, in view of the attendant facts and conditions.

It is urged that the bill fails to state a cause of suit for specific performance or an injunction, in that it is concerning personalty, and that it appears that complainant has a plain, speedy, and complete remedy at law, and, further, that the conditions are such that a court of equity will not intervene to enforce specific performance. I will not attempt to pass categorically upon the bill as to its sufficiency, except to inquire whether the questions presented are grave and weighty, and difficult of solution, and such as to call for a maintenance of the status quo during the pendency of the litigation.

[5] It can no longer be maintained that a suit will not lie for the specific performance of a contract respecting personalty. The underlying thought touching such a suit is whether the suitor has a plain, speedy, adequate, and complete remedy at law. If he has, he cannot have specific performance. Mechanics' Bank v. Seton, 1 Pet. 299, 7 L. Ed. 152; Express Co. v. Railroad Co., 99 U. S. 191, 25 L. Ed. 319; Texas Co. v. Central Fuel Oil Co., 194 Fed. 1, 114 C. C. A. 21; Livesley v. Johnston, 45 Or. 34, 76 Pac. 13, 946, 65 L. R. A. 783, 106 Am. St. Rep. 647.

[6] The bill herein does show, practically without question, that the complainant has not as plain, adequate, and speedy a remedy at law as in equity. I need only instance the fact, which appears both by the bill and by the affidavits adduced and on file herein, that the ores produced by the Mining Company have a peculiar value for smelting purposes, and are not readily obtainable elsewhere, and it would be practically impossible to measure their value for determining the loss plaintiff would sustain if it were not able to obtain them under the contract. The instance is weighty in itself. Others might be added, of cumulative value, but I will not stop, nor is it necessary, to recount them.

[7] As to the practicability of a court of equity enforcing the terms of the agreement, it would seem to be comparatively simple, at least

as it pertains to the normal product. The agreement is for the sale and purchase of these ores. They consist of the product of the mines of the Mining Company. The only stipulation that would seem to present an obstacle to a court's requiring performance is that the Mining Company shall "operate all its said mines." There is no provision respecting the manner of their operation requiring any supervision of the court as to details, but the simple agreement that the Mining Company shall actively operate the mines. There seems to be no plausible reason why the court may not require a performance on the part of the Mining Company in this respect. The production of ores is, of course, a result of the active operation of the mines, and these ores the Mining Company is required to sell and deliver to the Smelting Company. The relief asked is that the Mining Company, in pursuance of its undertaking, continue their delivery to the plaintiff. There are no delicate or complex conditions involved in their production or delivery, or in obtaining the stipulated price agreed upon to be paid for them; nothing apparent that will necessitate supervisory control in requiring performance on the part of the Mining Company. There is a provision respecting the assay upon which the price is to be fixed, which looks to the possible submission of the assay to an umpire for adjustment where the assayers for the two companies do not agree. So far as the record shows, up to this date, and for more than 12 years, there has been no necessity for submission to the umpire. But this aside, the umpires are specifically named, and if it should turn out that the parties do not agree, the submission automatically takes place, and the matter is adjusted. It requires no supervision of the court, therefore, for ascertaining and fixing the price which the Mining Company is to receive for its ores. There is a stipulation in the supplemental agreement of May 4, 1905, providing for filling vacancies in the list of persons designated to act as umpires in case any one of the list should be rejected by either of the parties, but this does not materially affect the situation.

[8, 9] It is urged that, even as to these ores of normal grade, there is accorded under a certain contingency an option to the Smelting Company to purchase them. This is based upon the second paragraph of the supplemental agreement of May 4, 1905. The true meaning and purpose of the paragraph is not at all clear. It seems incongruous and out of harmony with the other stipulations of both the original and the supplemental agreements. It should, however, under one of the canons of construction, be considered in connection with the other stipulations, respecting the same subject-matter, contained in both the original and supplemental agreements. The third paragraph of the supplemental agreement provides that the terms that are to govern (transposing the statement for clarity) shall be those made by the A. S. & R. Company to a majority of the Cœur d'Alene shippers, unless the A. S. & R. Company shall go out of existence or shall cease to purchase a majority of the Cœur d'Alene ores. This is a specific and positive stipulation, and comes later in the agreement than the provisions of paragraph 2. It is then later provided, in the third paragraph, that in case the A. S. & R. Company shall cease to exist or shall cease to purchase

a majority of the tonnage of ore produced in the Cœur d'Alenes, then the terms given by the other smelting companies for a majority of the ores produced in the Cœur d'Alenes, after excluding certain ores specified, shall govern. This latter stipulation would seem also to be specific and positive. Yet in order to give it effect, paragraph 2 must be read in connection with this latter condition. So that if the smelting companies purchasing a majority of the Cœur d'Alene ores fix terms that the Smelting Company does not desire to meet, then the Mining Company may accept those terms, and ship its ores accordingly. But if the Smelting Company desires subsequently to meet the terms, it may do so by giving notice, etc. This is the option alluded to, and such is the construction that seems the more reasonable. It is the one that the parties have apparently acted upon and have considered to be binding in the execution of the agreement. But if I am mistaken as to this, the question presented is both weighty and difficult, and one which may well be deferred until the final hearing. If I am right in this construction, the exercise of the option is contingent upon conditions that have never as yet come about and may never arise. The contingency of the conditions arising under which the so-called option may be invoked is so remote that it places no material obstacle in the way of enforcing specific performance in equity. Guffey v. Smith, 237 U. S. 101, 35 Sup. Ct. 526, 59 L. Ed. 856.

[10] As it respects the high and low grades, the agreement as interpreted, and as acted upon by the parties, involves an option on the part of the Smelting Company to take them. But there seems to be no good reason why the Mining Company may not be required to deliver the ores when the option has been declared. I need not comment on this phase of the agreement further, however; nor do I attempt to determine precisely its legal aspect, or its bearing upon complainant's right to the relief demanded. Complainant's counsel, by their argument, are only asking that for the present the injunction extend to require a continuation of the delivery of the normal grade.

[11-14] Another question of importance relates to the assignability of the agreement; and, if assignable, a further inquiry arises as to what rights the assignee will acquire under the assignment.

By the eleventh paragraph it is expressly stipulated that:

"This agreement shall be binding upon and inure to the benefit of the successors and assigns of the respective parties hereto."

The general rule is that the right of one party to a contract to its performance is assignable, unless the assignment is unauthorized or forbidden by statute or by the terms of the contract itself. To this rule exist exceptions, and among them are contracts involving relations of personal confidence and contracts for personal service. If reliance be had for performance upon the integrity, credit, or responsibility of a party, or confidence or trust be reposed in him personally, the contract is without assignability. And so it is if it be one for personal services, involving the exercise of knowledge, taste, or skill, for it is said to be considered contrary to public policy that any person should exercise

such control of the power of another to choose for whom he shall labor. 5 C. J. 874, 882, 883.

The exceptions are concretely stated in Pollock on Contracts (4th Ed.) 425, as quoted in Arkansas Valley Smelting Co. v. Belden Co., 127 U. S. 379, 388, 8 Sup. Ct. 1308, 1309 (32 L. Ed. 246):

"Rights arising out of contract cannot be transferred if they are coupled with liabilities, or if they involve a relation of personal confidence such that the party whose agreement conferred those rights must have intended them to be exercised only by him in whom he actually confided."

But whether the contract falls within either branch of the exception is a question which must turn upon the intention of the parties, and must be eventually determined by consideration of the language employed, the kind of acts and services to be performed, and the nature and purpose of the contract itself. King v. West Coast Grocery Co., 72 Wash. 132, 129 Pac. 1081.

Now, turning to the contract, it is expressly stipulated that deliveries shall be made to any smelting plant owned by the Smelting Company, its successors, or assigns. Then follows the stipulation of the eleventh paragraph above quoted, respecting the binding effect and the inuring benefit to successors and assigns.

The parties have recognized the significance of this clause, by stipulating in the fourth supplemental contract that no assignment of the agreement shall be made without the consent of the Mining Company. This stipulation expired by limitation in June, 1915; but it serves to indicate, with much force, how the parties themselves regarded the primary stipulation.

In this connection, a matter is pertinent for consideration, though outside of any specific terms of the agreement. I refer to the Baruch purchase of the Smelting Company's stock. The purpose of the purchase, with scarcely a question, was to enable the A. S. & R. Company to control the affairs of the Smelting Company; and, when the present agreement was entered into, it was, by the strongest probability, within the contemplation of the parties that it would be convenient, and perhaps serviceable, that the agreement be assigned to the A. S. & R. Company, as it was designed that a large proportion, if not all, of the ores should, in the immediate future or at some stage of the time limitation of the agreement, be diverted to the A. S. & R. Company's smelters. So that when the Tacoma smelter, in January, 1912, ceased the smelting of lead ores, it was but natural that an assignment of the agreement should be made to what is termed the parent company, namely, the A. S. & R. Company. Thus, by the assignment, eventually transpired just what the parties contemplated might or should come about in the course of legitimate dealings respecting the agreement. True, it may be, as claimed by counsel for the Mining Company, that the Smelting Company would have no interest in the agreement after it ceased to smelt lead ores, except the right to direct shipments to other smelters; but the assignment has accomplished the very purpose of diverting shipments, and the diversion now is entirely to the A. S. & R. Company's smelters, and has put the A. S. & R. Company in a position to make the diversions in the stead of the Smelting Company. And

while the Smelting Company, subsequent to the assignment, could have no right of action against the Mining Company on account of future transactions, and is not in a position to demand specific performance or an injunction, yet, by the very terms of the stipulation that the agreement shall be binding upon and inure to the benefit of the successors and assigns of the respective parties, as well as by the extraneous contemplation of the parties as gathered from the attendant circumstances and conditions obtaining at the time the agreement was entered into, the A. S. & R. Company, by the assignment, succeeded to all the benefits to inure to the Smelting Company. Such being the case, the A. S. & R. Company is put exactly in a position to demand specific performance, and an injunction, if need be.

The assignment, it must be understood, cannot relieve the assignor of its obligations to the Mining Company under its agreement. 5 C. J. 879. But the Smelting Company having by the assignment delegated its performance to the A. S. & R. Company, and the A. S. & R. Company by accepting the assignment having become bound to perform as the Smelting Company was bound in the first instance, the Mining Company has lost no remedial rights, but instead has been accorded a like remedy against the A. S. & R. Company to that it had against the Smelting Company. In a broad sense, this is exactly what the parties from the very inception of the negotiations contemplated might happen.

I have examined with much care the cases of Arkansas Smelting Co. v. Belden Co., supra, Wooster v. Crane & Co., 73 N. J. Eq. 22, 66 Atl. 1093, Central Brass Co. v. Stuber, 220 Fed. 910, 136 C. C. A. 475, Swarts v. Narragansett Lighting Co., 26 R. I. 436, 59 Atl. 111, and Rice v. Gibbs, 33 Neb. 460, 50 N. W. 436, and 40 Neb. 264, 58 N. W. 724, and find no pertinent analogy of the facts upon which those cases are based to those of the present case, except the last cited. The Wooster Case is a good example of contract provisions which, as it was there held, do not render the contract assignable. The contracts purport to have been made between Lizzie E. Wooster and Crane & Co., their successors and assigns, and it was stipulated that: .

"The above agreements are made with the understanding that the said Crane & Co. and their representatives and assigns shall in substantial good faith keep and perform their agreement hereinafter contained."

Pitney, Advisory Master, states the pith of the controversy in a single sentence:

"I am," says the master, "unable to construe it as a contract on the part of Miss Wooster to deal with anybody to whom Crane & Co. may assign that contract and to accept such assignee as paymaster."

Not so with the agreement of the parties here, which is specific that it shall be binding upon and inure to the benefit of the successors and assigns.

In the Nebraska case, it was held on the first hearing that the contract involved was assignable, and the ruling was not departed from on the rehearing. After setting forth the stipulation which it was claimed rendered the contract assignable, the court says:

"The precise point in the construction of this contract is not whether it is in its nature assignable, so that, its conditions being performed, an assignee might enforce it, but whether or not the plaintiff in this case as assignee did perform or tender a performance of those conditions."

So the case was determined upon the question whether the assignee had performed, thus in effect conceding the assignability of the contract.

The record does not show in the Belden Case what provision was made in the contract respecting assignment.

[15] Another question is presented, arising from the fact that now, since the assignment of the agreement, the A. S. & R. Company is constituted an agent for fixing the price of ores which that company is itself purchasing. Under the agreement, however, it is not fixing the price arbitrarily, but the price to govern is that which the A. S. & R. Company shall make to a majority of the Cœur d'Alene shippers. At the time of entering into the contract, it is manifest that the Mining Company was satisfied to take what the majority of the Cœur d'Alene shippers could get for their ores; and, while the A. S. & R. Company has now become in effect a party to the contract, the Mining Company will still be able to obtain what it contracted for. In reality, this is another condition that the Mining Company contemplated might eventually happen, and it can hardly insist now that the agreement is void because it did happen.

Another suggestion is that the A. S. & R. Company has brought about an unlawful combination with other smelting companies, so that it has a monopoly of the market for the purchase of lead ores, and, for that reason, that it ought not to be allowed to prevail here. While there is a surmise that such may be the case, the testimony in the record falls far short of establishing the fact.

I conclude that a preliminary injunction should issue restraining the Mining Company from disposing of any of its lead ores of normal grade to any other person or corporation than the plaintiff, and from itself smelting such ores in its own behalf, upon the giving of a bond by the plaintiff in the sum of $20,000, to indemnify the Mining Company for any loss it may sustain if the injunction be wrongful or without sufficient cause.

I will hear the parties further, if they desire to be heard, as to the amount of the bond.